## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

THE UNIVERSITY OF NOTRE DAME (USA)
IN ENGLAND,

               Plaintiff,

    v.

TJAC WATERLOO, LLC AND
ZVI CONSTRUCTION CO., LLC,

               Defendants.

C.A. No.  1:16-cv-10150

## AMENDED COMPLAINT

Plaintiff The University of Notre Dame (USA) in England ("UND"), on personal knowledge as to itself and otherwise on information and belief, submits this Amended Complaint against TJAC Waterloo LLC ("TJAC") and ZVI Construction Co. LLC ("ZVI" and, collectively, "Defendants") following Defendants' removal of this action from the Suffolk Superior Court:[1]

## NATURE OF THE ACTION

1.  This is an action upon a judgment obtained by UND as a result of an ongoing litigation in England wherein, on July 21, 2015, UND obtained a final and binding liability judgment against TJAC and ZVI (the "Judgment").  According to the Judgment, Defendants were found to have breached the parties' contract relating to the purchase and renovation of the Royal Waterloo Hospital, located at 51-55 Waterloo Road, London SE1 8TX ("Conway Hall"), an historic building that UND purchased from TJAC for nearly $59 million in December 2011 to house students studying at UND's London campus (the "Contract").

---

[1] As further support for its Amended Complaint, UND directs the Court to the sworn affidavit of Laurence Harris, submitted concurrently in support of UND's Motion for Temporary Restraining Order and Preliminary Injunction. Dkt. Nos. 9 (Motion), 11 (Affidavit).

2.   The parties' Contract required Defendants to refurbish Conway Hall prior to its sale to UND.  Defendants were to ensure that the work complied with all necessary laws, regulations and codes, was of a good and workmanlike manner, and free from defects.  Not long after taking possession of Conway Hall, however, a number of defects arose, which were reported by UND. Many of these defects were serious and critical safety defects.  As time progressed, the number of defects increased and the severity worsened.  The parties reached an impasse in their attempts to remedy the defects.

3.   Unable to reach an acceptable resolution to remedy the defects, UND invoked its contractual right to seek a binding Expert Determination under the Contract.  As set forth in the Affidavit of Laurence Harris ("First Harris Aff."), *see* Dkt. No. 11, Partner in the London office of Cooley (UK) LLP,  the parties agreed to have certain issues adjudicated by an expert in the field rather than in the courts or through some other process.  After the presentation of evidence to the expert, which included, written briefing, oral argument, site visits, witness testimony, and the circulation of the expert's preliminary findings, on July 21, 2015, UND received a Judgment in its favor – the final and binding Expert Determination on Defendants' Liability ("Expert Determination").[2]  UND and the instant defendants agreed that the Expert Determination end the liability phase of the proceedings.

---

[2] Defendants purportedly removed this action "under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), 9 U.S.C. §§ 201, et seq…."  Dkt. No. 1 (Notice of Removal).   This Court must be satisfied that the Expert Determination involves the type of dispute resolution process encompassed by the Convention.  *See Infuturia Global Ltd. v. Sequus Pharm., Inc.,* 631 F.3d 1133, 1138 (9th Cir. 2011).  Here, Clause 17 of the parties' Contract contemplates that ongoing proceedings in England are a form of alternative dispute resolution known as "expert determination." Arbitration is separate proceeding or process from the Expert Determination and defined separately in the Contract.  *Compare* Ex. A of Second Harris Aff. (attached to UND's Memorandum in Support of its Request to Enforce Foreign Arbitral Award as Exhibit 1) (Contract Clause 17.1) (directing disputes regarding the parties' "respective rights duties and obligations [thereunder] or as to any matter arising out of or in connection with the subject matter of this agreement" to an "independent duly experienced surveyor") *with* (Contract Clause 17.2) (directing disputes "as to the meaning or construction of this agreement" to an "independent solicitor or barrister" who "shall act as an arbitrator in accordance with the Arbitration Act 1996."). Likewise, the Expert Determination, on which the instant action is predicated, itself states "Expert Determination is not an Arbitration," and notes that the expert sought clarification that his appointment was not that of an arbitrator.

4.  As a result of Defendants' liability being fully and finally established, UND is entitled to substantial money damages, which UND calculates to be approximately $8.5 million.  UND's quantification of damages was submitted to the Defendants in the English expert proceeding in October 2015, and is included in summary form in the First Harris Affidavit.  The precise amount of UND's damages award will be determined during the upcoming damages or "quantum" phase of the proceedings.

5.  UND attempted for several months to reach agreement with Defendants regarding the scheduling of the damages phase of the proceedings, which, despite UND's efforts, Defendants repeatedly delayed.  Accordingly, UND asked that Defendants – both Massachusetts limited liability companies – to agree not to dissipate or encumber assets outside of the normal course of their business, so that such assets will be available to UND upon receipt of the damages award.  Defendants have refused to agree to UND's request or provide any similar assurances or security.  Indeed, Defendants also refused for months to confirm whether they had maintained millions of dollars in insurance that would provide some protection for UND's losses.

6.  Notwithstanding Defendants' repeated refusals and misdirections, Defendants acknowledged in open court on February 10, 2016 that they allowed to lapse the insurance coverage as to which UND had been seeking assurances.  For months preceding that forced admission, Defendants did not inform UND that the insurance had lapsed, despite being asked directly.  Rather than simply answer the questions, Defendants instructed UND to talk to their insurance broker who, it turned out, had no information to provide.  UND is not aware of any assets available in the United Kingdom to satisfy its anticipated damages award.

---

*See* Ex. B to Second Harris Aff. (Expert Determination).  Notwithstanding how United States law interpreting the Convention may classify the proceedings in this action for purposes of this Court's jurisdiction, UND does not admit that English proceedings before the expert are an arbitration.

7.   Accordingly, UND seeks an order that the Court (1) recognize and enforce the Expert Determination under the Convention and/or M.G.L. c. 235 § 23A,  (2) attach Defendants' assets and accounts in an amount not to exceed $8.5 million, (3) temporarily restrain and preliminarily enjoin Defendants and issue additional relief as requested, and (4) issue a declaratory judgment as set forth below.

## PARTIES

8.   Plaintiff UND is a company and registered charity incorporated under the laws of England and Wales with a principal place of business in the United Kingdom.

9.   Defendant TJAC is a limited liability company organized under the laws of the Commonwealth of Massachusetts with a principal place of business at 930 Commonwealth Avenue, Boston, Massachusetts (County of Suffolk).  TJAC is engaged in the business of real estate development.  Pursuant to the parties' Contract, UND purchased Conway Hall from TJAC.

10. Defendant ZVI is a limited liability company organized under the laws of the Commonwealth of Massachusetts, with a principal place of business at 131 Dummer Street, Brookline, Massachusetts (County of Norfolk).  ZVI's website touts Conway Hall as its "spectacular, cutting-edge student housing facility [which was] the result of ZVI's . . . gut renovation [and that ZVI was] responsible for all aspects of this build-and-design project . . . [including] restoration of the authentic façade, intricate interior décor . . . ."

11. Defendants are related Massachusetts-based limited liability companies woven together through an interrelated web of development, construction, and property management companies.  For example, the same individual, Zvi Schwarzman, TJAC's Manager, signed the Contract on behalf of both TJAC and ZVI as "Manager" of both entities.  Mr. Schwarzman is also a founding partner of The Triad Group, which, according to its website, touts itself a "premier full service real estate company" and identifies ZVI as an "affiliated company" and

further notes that "in association with, TJAC Development [an affiliated, legal entity to TJAC Waterloo LLC], [The Triad Group] has a comprehensive focus toward the development of student housing and corporate apartment facilities within the U.S. and abroad." *Id.* TJAC Development's website (1) indicates that its "Corporate Headquarters" are located at the same Brookline, Massachusetts address as ZVI, (2) directs users to http://www.zviconstruction.com, (3) states that "TJAC works hand-in-hand with public and private institutions and international study abroad programs to provide cost-effective solutions for student housing requirements," and (4) lists Zvi Schwarzman as a Co-Founder and Managing Director.  TJAC Waterloo LLC, not TJAC Development, was a party to the Contract; nonetheless, TJAC Development's website's main landing page proudly displays a photograph of Conway Hall (i.e., also known as the Waterloo residence), reflecting again that Defendants and other affiliated entities are under common control and clearly acting in concert.

## JURISDICTION & VENUE

12. The United States of America and the United Kingdom are signatories to the Convention, which was ratified by Congress and codified at 9 U.S.C. §§ 201 *et seq*.

13. To the extent the Court finds that the Expert Determination falls under the Convention, this Court has federal question jurisdiction under 9 U.S.C. § 203.

14. This Court has personal jurisdiction over Defendants because Defendants have their principal place of business in Massachusetts.

15. Venue is appropriate in the District of Massachusetts pursuant to 9 U.S.C. § 204.

16. The Court has supplemental jurisdiction pursuant to 28 U.S. Code § 1367.

## FACTUAL BACKGROUND

*The Parties' Contract*

17. On October 25, 2010, UND and Defendants entered into a contract that provided that UND would purchase Conway Hall from TJAC for the sum of $58,833,700 after its affiliate ZVI performed extensive renovations to the building so that it could be used to house students studying at UND's London campus.

18. Pertinently, the Contract states as follows:

> The Seller warrants to the Buyer that . . .  The Seller has exercised and will continue to exercise all reasonable skill care and attention in relation to the Works generally and in the co-ordination and management of the Works of the Contractor in carrying out the Works and in instructions given or to be given to the Contractor.  [Clause 7]

> The Seller shall from the date hereof diligently and expeditiously procure that the Works are carried out and completed.  [Clause 11.1]

> . . . in accordance with the Approved Documents and the Consents and within the boundaries of the Property.  [Clause 11.1.1]

> . . . in a good and workmanlike manner, in accordance with good building practice, free from defects, using new materials of good quality in accordance with British Standards.  [Clause 11.1.2]

> . . . in accordance with the provisions of Schedule One [pertaining to compliance with relevant statutes and by-laws, including as they relate to fire codes].  [Clause 11.1.8]

> . . . so that at the Completion Date the Property will be fit for its intended purpose as stipulated in the Approved Documents.  [Clause 11.1.11]

19. As such, Defendants were responsible for the preparation of the detailed design, layouts and specifications for the building refurbishment, as well as for obtaining all necessary approvals and ensuring that the building complied with all necessary regulations and codes.  At bottom,

Defendants were responsible for delivering a building that was habitable and fit to use as student accommodation, free from defects.

***Defendants' Breaches of the Contract***

20. UND reported a growing number of defects following its purchase of Conway Hall. Many of these were very serious safety critical defects that existed throughout the building.

21. For example, several problems with the building's fire system soon became apparent, such as the fact that ZVI's fire alarm sub-contractor was repeatedly called back to Conway Hall to fix frequent false alarms.  Rather than fix the issues, however, the sub-contractor simply removed the fire detectors altogether, unacceptably increasing the risk of injury or death to the residents of Conway Hall in the event of a fire.  Furthermore, on August 1, 2013, the London Fire Brigade visited the property, at which time it became clear that the layouts of the apartments were inadequate to allow proper egress.  As a result, the London Fire Brigade required certain rooms to be closed immediately, and UND had to undertake substantial work to correct Defendants' errors.

22. Fire safety issues were not the only life safety issues that arose.  For example, terracotta tiles from the front façade of the building began falling onto the public footpath below, necessitating the erection of an emergency scaffold in October 2013 to prevent serious injury to passers-by.  Moreover, a large pane of secondary glazing[3] that was not made of safety glass, as required by the relevant building regulations in the United Kingdom, was broken in a student's bedroom.  The subsequent breakage of the panel of glass once removed from Conway Hall confirmed UND's worst fears when it shattered into large and dangerous shards that had the potential to cause serious injury to the residents of the building.  It was clear that safety glass had not been used, which in a building like Conway Hall that was being used to house students, was

---

[3] Secondary glazing is an independent window system retrofitted on the inside of an existing window.

unacceptable and required the removal of all the secondary glazing installed throughout the building for health and safety reasons.

23. As a result of these problems and a host of others, UND retained a professional building consultant to review the building and make recommendations as to how to address the serious defects resulting from Defendants' breaches of the Contract and other violations.  UND also retained other experts, including building consultants, structural engineers, stonework and restoration specialists, and fire safety specialists.  These experts identified numerous serious defects, many of which were safety critical.

***UND Obtains a Final & Binding Liability Determination in the United Kingdom***

24. Though Defendants agreed to correct a small number of issues, they declined to remediate all of the defects and problems that UND identified.  Accordingly, UND pursued its contractual right to recoup its losses.

25. Section 17.1 of the parties' Contract requires that disputes of the nature outlined above be referred to an expert in the field responsible for adjudicating the dispute and issuing a ***final and binding*** decision.  Specifically, the Contract provides as follows:

> Save as otherwise provided in this agreement any dispute arising between the parties hereto as to their respective right duties and obligations hereunder or as to any matter arising out of or in connection with the subject matter of this agreement (other than any with regard to the meaning or construction of this agreement) shall be determined by an independent duly experienced surveyor appointed (in default of agreement between the Buyer and the Seller within ten Working Days from the dispute arising) by the President or other proper officer of the Royal Institution of Chartered Surveyors on the application of either the Buyer or the Seller and:
>
> . . . such person shall act as an expert and **his decision shall be final and binding on the parties hereto**. . .

26. Pursuant to the Contract, the parties appointed an expert to govern the proceedings. Defendants admit that the parties agreed to "determine liability first" and damages second. *See* Dkt. No. 12-1 (Affidavit of Patrick Watson-Hogan, Member of TJAC and President of ZVI). The expert acknowledged this agreement to bifurcate the proceedings in his preliminary and later final determinations of liability noting: "The Respondents have agreed on terms to hearings split between liability and quantum and to decisions which reflect that split . . . ."

27. On May 30, 2015, the expert issued "A Document of Preliminary Indications on Liability" ("Preliminary Indications") and invited the parties to provide final comments. Specifically paragraph 3.3 of the Preliminary Indications explained:

> The Issues are rehearsed below.  **They are not the final Decisions on Liability.   The parties may now make a final comment. Thereupon liability will be determined and published**.

28. Both parties submitted final comments on the expert's preliminary indications on liability. Defendants did not attack or comment on the expert's understanding that after the final comment period, his determination as to liability constituted a ***final and binding*** judgment.

29. On July 21, 2015, the expert issued a ***final and binding*** Expert Determination as to the Defendants' liability.  Paragraph 3.3 of the Expert Determination explained.

> The Issues are rehearsed below. Preliminary "indications" were given 30 May 2015 and invited final comment.  They were made (served)  16/06/15-22/06/15.  **This document of today's date publishes the binding decisions as to Liability.**

30. The lengthy and detailed written Judgment sets forth the scores of issues on which UND prevailed, a sampling of which are outlined below.

31. With respect to the building's exterior, the decision states, in relevant part, as follows:

> [ISSUE] 11:  Structure: Building Exterior

Whether (as a consequence of breach) repairs are required to the multitude of cracks apparent in the exterior masonry skin.

AND

[ISSUE] 12:  Whether (as a consequence of breach) repairs are required to the building exterior wall so that all materials and ornamentation are securely re-attached to the building structure and are ready to successfully serve as a part of the building skin for at least 40-years *provided they are properly maintained going forward.*  The scope of this work shall include tuck-pointing of the brick masonry mortar joints, diagnosis of and repairs to cracks and other forms of failures, repairs or replacement of corroded metal ties and anchors, and other repairs as required."

<u>EXPERT</u>: YES, within limits.

It is fair to point out that the task is to repair, make good, reasonably look for defects and bring to fair standard. The front entrance is below that standard and probably handed-over as such. The cills are accepted as below par.  The façade columns (dressed steel) and use of epoxy failed and remains a liability to ZVI. Generally there ought not be severely cracked or missing tiles, copings, or finishings. . . .

32. UND seeks over $1.35 million [£940,000][4] for the repairs to the building's exterior for which Defendants were found liable in Paragraph 31.

33. With respect to the issues with the building's fire safety system, the decision states, in relevant part, as follows:

[ISSUE] 21:  Whether (as a consequence of breach) layout changes are required to the majority of the flats within Conway Hall to place their kitchens in separately walled rooms within each flat so as to allow safe escape in the event of a fire or otherwise to comply with Building Regulations.

<u>EXPERT</u>:  YES to a limited extent.

. . . it remained a duty on TJAC/ZVI to ensure that the layout complied with the requirements of the Regulations.  .  .  .

---

[4] For the Court's convenience, UND provides herein the amounts claimed in British Pounds and in U.S. Dollars, as converted on January 28, 2016 using a conversion rate of $1.44 British Pounds per U.S. Dollar.

TJAC/ZVI is liable to have made appropriate layout changes. . . .
I . . . . remain convinced that the 22/24 units are in breach.

[ISSUE] 24:  Whether as a consequence  of breach  remedial works
to the fire doors within Conway  Hall  are  required to ensure
doors and  additional  hardware (smoke seals, self-closing devices
etc.) are fully compliant with the relevant fire safety regulations
and Building Regulations?

(Tony Bingham) EXPERT'S DECISION: YES.

[ISSUE] 61:  Whether (as a consequence of breach) remedial
works to the fire alarm panel to ensure appropriateness of the
system capacity for the number of heads, to review the feasibility
of splitting the alarm into 2 zones, are required and/or to ensure
that the Fire Alarm System is fully functioning.

(Tony Bingham) EXPERT'S DECISION:  YES.

34. UND seeks nearly $1.25 million [£872,000] for just the  repairs to the building's fire

safety system for which Defendants were found liable in Paragraph 33.

35. With respect to the issues of secondary glazing, the decision states:

ISSUE No.1 in Miscellaneous Defects: -"*Secondary Glazing*" -
Whether secondary glazing  was installed by TJAC to meet  the
acoustic  and thermal  specification agreed;  whether  (as  a
consequence  of  breach),  the secondary  glazing  installed  was
unsafe  and/or in  breach  of  good  building practice; whether it
was   therefore necessary to remove   the   secondary glazing
installed by TJAC/ZVI?

Whether (as  a consequence of breach) remedial Works to meet
the  acoustic  and thermal specification agreed  by the installation
secondary glazing  or other appropriate measures are  required?

EXPERT (Tony Bingham) says:  The installed glass was incorrect
and in breach of the second specification.

36. UND seeks over $573,000 [£398,000] for the repairs to the secondary glazing for which

Defendants were found liable in Paragraph 35.

37. In summary, the expert found Defendants liable for the majority of the more than 70 issues presented by UND.  UND seeks more than $8.5 million [£5,961,214] in combined damages for these issues, including (1) approximately $6 million [£4,221,716] to repair the serious building defects including both building costs and associated consultancy fees; (2) over $950,000 [£681,719] in student relocation fees; (3) to date, in excess of $1.28 million [£895,536] in legal fees and expert fees; and (4) more than $630,000 [£441,407] in respect of unrecoverable value-added tax ("VAT"); but (5) giving credit for a retention sum of $400,000 [£279,165].

38. Defendants did not appeal the Expert Determination, nor can they.

***Defendants Delay the Damages Phase of the Proceedings, Refuse to Agree Not to Dissipate Assets, and Fail to Maintain Insurance Mandated by the Contract***

39. UND served its opening brief and voluminous supporting proof in the damages phase of the proceedings on October 16, 2015, and therein set forth in detail for Defendants the damages sought and summarized above.  The submission, including its evidentiary bases, exceeded 1000 pages in length.  On October 21, 2015, after having UND's damages submission for five days, Defendants' London-based counsel sought to delay the damages proceedings, citing "serious health issues" affecting a member of the Defendants' businesses, but declining to identify who was ill or any additional details.  Indeed, Defendants did not disclose the identity of that individual until December 2, 2015, six weeks later, and only after UND's counsel contacted the expert to inform him that the parties were unable to agree on Defendants' requests to delay proceedings and modify the scheduling order.

40. In fact, UND was generally willing to accommodate Defendants' request to delay if Defendants agreed not to take advantage of the delay by dissipating or encumbering their assets or transferring them beyond UND's reach.  Specifically, UND requested that, among other things, Defendants (1) agree not to transfer or dispose of their assets outside of the normal course

of business unless reasonable prior notice is given to UND (which would then allow UND the opportunity to object or seek other relief), and (2) provide confirmation that Defendants continue to comply with clause 12.2 of the parties' Contract, which requires ZVI to maintain  indemnity insurance for not less than £5 million ($7.2 million) for a minimum of 12 years following practical completion of the project.

41. Defendants refused to agree to these requests.

42. With respect to UND's request that Defendants confirm that they carry the contractually-required amount of insurance, a request that demands a simple "yes or no" response, Defendants have asserted that there is no such obligation.  That assertion is false. In fact, counsel for ZVI ultimately admitted in Court that ZVI failed to maintain the insurance and that this failure constituted a breach of contract.  UND is aware of no other insurance that would satisfy UND's anticipated recovery or any portion thereof.

## COUNT I

### (CONFIRMATION OF FOREIGN ARBITAL AWARD UNDER 9 U.S.C. § 207) (ALL DEFENDANTS)

43. UND repeats and re-alleges paragraphs 1 through 42 as if fully set forth herein.

44. UND has obtained a binding determination on Defendants' liability for serious defects and related issues following the renovation of Conway Hall.

45. Subject to the Court's determination, the Expert Determination falls under the Convention.

46. The parties' relationship and the Expert Determination arise out of legal and contractual relationships that are commercial.  9 U.S.C. § 202.

47. The Convention governs the enforcement and confirmation of foreign arbitration awards, and, subject to the Court's so finding, the Expert Determination, which was issued in England—a New York Convention Nation.  9 U.S.C. §§ 201, 202.

48. This Court has authority to confirm the Expert Determination under 9 U.S.C. § 207, as it is a final award as to liability.

49. No grounds for refusal of or deferral of recognition or enforcement exist.  9 U.S.C. § 207.

## COUNT II

**(ATTACHMENT)**
**(ALL DEFENDANTS)**

50. UND repeats and re-alleges paragraphs 1 through 49 as if fully set forth herein.

51. Massachusetts law provides for the attachment of a defendant's property.  G.L. c. 223, §§ 42-83A.

52. UND has obtained a binding determination of Defendants' liability for serious defects and related issues following the renovation of Conway Hall. UND is likely to obtain a damages judgment equal to or greater than $8.5 million for the injuries it sustained as a result of these serious defects for which Defendants have already been found liable.

53. Defendants failed to maintain contractually required liability insurance for not less than £5 million ($7.2 million). UND is aware of no other insurance that would satisfy the anticipated judgment either in whole or in part.

54. UND is entitled to an attachment issued against Defendants and their assets.

## COUNT III

**(TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF)**
**(ALL DEFENDANTS)**

55. UND repeats and re-alleges paragraphs 1 through 54 as if fully set forth herein.

56. UND has obtained a final and binding determination on Defendants' liability for serious defects and related issues following the renovation of Conway Hall.

57. Defendants have delayed the damages phase of the proceedings and refuse to agree not to dissipate, encumber or transfer certain assets as requested by UND.

58. Defendants failed to maintain contractually required liability insurance for not less than £5 million ($7.2 million). UND is aware of no other insurance that would satisfy the anticipated judgment either in whole or in part.

59. UND will be irreparably harmed if Defendants are not temporarily and preliminarily enjoined from dissipating, encumbering or transferring assets as requested herein.

60. Accordingly, pursuant to Fed. R. Civ. P. 65, UND seeks temporary and preliminary injunctive relief as set forth below.

## COUNT IV

## (RECOGNITION OF FOREIGN JUDGMENT PURSUANT TO M.G.L. C. 235 § 23A)

61. UND repeats and re-alleges paragraphs 1 through 60 as if fully set forth herein.

62. UND has obtained a final and binding judgment on Defendants' liability for serious defects and related issues following the renovation of Conway Hall.

63. The judgment is conclusive because it is enforceable in England.

64. England recognizes Massachusetts judgments.

65. Defendants had notice of the proceedings before the expert, and such proceedings were consistent with the agreement between the parties. The judgment was not obtained by fraud, nor does it conflict with any other judgment. The action on which the judgment was based is not repugnant to the public policy of Massachusetts.

66. UND is entitled to an order from this Court recognizing and enforcing the Expert Determination of liability.

## COUNT V

### (DECLARATORY JUDGMENT)
### (ALL PARTIES)

67. UND repeats and re-alleges paragraphs 1 through 66 as if fully set forth herein.

68. An actual controversy exists between the parties concerning Defendants' ability and/or willingness to satisfy or pay an award of damages to UND of at least $8.5 million.

69. UND has sought appropriate assurances that such a damages award can be satisfied by the Defendants, or that insurance is available to do so.  Defendants have failed and refused to provide appropriate assurances and has allowed insurance coverage to lapse.

70.  Accordingly, pursuant to 29 U.S.C. § 2201(a), UND seeks a judicial declaration as set forth below.

WHEREFORE, UND respectfully requests that the Court:

A.  Pursuant to Fed. R. Civ. P. 65(a):

    a. immediately and temporarily restrain Defendants, together with their affiliates, members, corporate parents and subsidiaries, control persons and those acting in concert with them, from dissipating, encumbering, or transferring assets until further order of the Court, and only as necessary in the normal course of their business.

B.  Pursuant to Fed. R. Civ. P. 64(a) and Fed. R. Civ. P. 65(b):

    a. find that UND has carried its respective burdens of showing the irreparable harm and/or likelihood of success on the merits, where appropriate;

b.  preliminarily enjoin Defendants, together with their affiliates, members, corporate parents and subsidiaries, control persons and those acting in concert with them, from dissipating, encumbering or transferring assets until further order of this Court, and only as necessary in the normal course of their business;

c.  order Defendants to provide an accounting of their respective finances, including without limitation any transfers or encumbrances from December 1, 2013, the month preceding Defendants' initiation of English proceedings, to the present; and

d.  order that the preliminary injunction shall take effect immediately as to these Defendants, their affiliates, members, corporate parents and subsidiaries, control persons and those acting in concert with them, and shall remain in effect pending further notice of the Court.

C.  Pursuant to Fed. R. Civ. P. 64 and G.L. c. 223, §§ 42-83A:

a.  find that UND has carried its burden of showing its likelihood of success on the merits; and

b.  Attach the assets of Defendants, together with their affiliates, members, corporate parents and subsidiaries, control persons and those acting in concert with them, with attachment not to exceed $8.5 million.

D.  Pursuant to 9 U.S.C. §§ 201, 207 and Article VI of the Convention, 21 U.S.T. 2517:

a.  Confirm and enforce UND's liability judgment against Defendants; and

b.  Award such other and proper relief as this Court deems fit without limitation and including suitable security.

E.  Pursuant to M.G.L. c. 235 § 23A:

    a.  Recognize and enforce UND's liability judgment against Defendants.

F.  Pursuant to 29 U.S.C. § 2201(a), a judicial declaration that:

    i.  An Expert Determination establishing the Defendants' liability was issued in UND's favor in England as set forth herein;

    ii.  The Expert Determination is final and binding on the parties as to liability;

    iii.  Defendants have failed and refused to provide appropriate assurances that they have sufficient assets or other resources, including insurance, to satisfy a money judgment against them and in UND's favor, and Defendants have confirmed that they failed to maintain insurance mandated by the Contract; and

    iv.  the issuance of injunctive relief is necessary to preserve UND's rights and prevent the dissipation, encumbrance or transfer of funds or other assets beyond its reach during the pendency of the remaining proceedings in England.

G.  Award UND discovery of Defendants' assets;

H.  Award UND its costs and attorneys' fees incurred in this action; and

I.  Award such other and further relief as it deems fit and proper.

Respectfully submitted,


/s/ *Robert B. Lovett*
Robert B. Lovett (BBO #561691)
Michael J. McMahon (BBO #679053)
Elizabeth A. Trafton (BBO #693969)
COOLEY LLP
500 Boylston Street
Boston, MA  02116-3736
Tel:  (617) 937-2300
Fax:  (617) 937-2400

*Counsel to Plaintiff The University of Notre Dame (USA) in England*

February 16, 2016

## CERTIFICATE OF SERVICE

I, Michael J. McMahon, hereby certify that pursuant to Local Rule 5.4(C), this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).  For those parties indicated as non-registered participants, if any, a paper copy will be sent by facsimile and/or U.S. First Class Mail on February 16, 2016.

*/s/ Michael J. McMahon*
Michael J. McMahon

127626927 v5